# In the United States Court of Federal Claims

No. 15-1567L

(Filed: March 29, 2019)

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

|  |  |
|---|---|
| **MARY SWARTZLANDER,** | **Fifth Amendment Taking; Statute of Limitations; Accrual of Cause of Action; Erosion; Stabilization Doctrine; Accrual Suspension Doctrine.** |
| Plaintiff, | |
| v. | |
| **THE UNITED STATES,** | |
| Defendant. | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

Marianne Dugan, 259 East 5th Avenue, Suite 200-D, Eugene, OR 97401, for Plaintiff.

Jean E. Williams, Jeffrey H. Wood, and William J. Shapiro, U.S. Department of Justice, Environment and Natural Resources Division, 501 I Street, Room 9-700, Sacramento, CA 05814, and John P. Tustin, Emily M. Meeker, and Cullen Saint-Real Sherburn, United States Department of Justice, Environment and Natural Resources Division, P.O. Box 7611, Washington, D.C. 20044-7611, for Defendant.

---

**OPINION AND ORDER**

---

**WILLIAMS**, Senior Judge.

Plaintiff, Mary Swartzlander, claims that the Bonneville Power Administration ("BPA") effected a taking of her property and seeks just compensation. Specifically, Plaintiff claims that the BPA, which owned property directly across the Chickahominy Creek from Plaintiff's property, undertook a wetland restoration project on BPA's side of the creek that deflected the creek flow towards Plaintiff's bank, causing erosion on Plaintiff's land.

Defendant moved to dismiss this action as time-barred under the six-year statute of limitations in 28 U.S.C. § 2501, arguing that Plaintiff knew or should have known that this erosion was occurring and causing permanent harm more than six years before she filed suit on December 23, 2015.[1] For the reasons stated below, Defendant's motion is granted.

---

[1]  In the alternative, Defendant argues that the alleged impacts from its restoration project were not foreseeable, and that Oregon Revised Statute § 496.270(3) precludes liability for damages

# Findings of Fact[2]

## The Wetland Restoration Project

In 2001, BPA entered into a contract with the Siuslaw Soil and Water Conservation District ("Conservation District"), to complete a wetland restoration project along BPA's creek banks. David Eisler, a project manager with the Conservation District, spearheaded the project, which included three primary elements: (1) digging an overflow channel and pond on the northern end of BPA's property to reduce flows on the creek, (2) clearing shrubs and replanting native vegetation in an elk meadow on BPA's property, and (3) planting native riparian plants along a small portion of the banks of BPA's property to reduce erosion. Tr. 576-77.

According to the wetland restoration project proposal, the purpose of the project was to restore "freshwater wetlands in the floodplain of Chickahominy Creek . . . through restoration of hydrological conditions, control of invading introduced plants . . . and reestablishment of native plant species," as well as to "reduce sediment load in Chickahominy Creek by revegetation of eroding vertical banks, enhance habitat conditions for amphibians, and improve fish habitat in Chickahominy Creek." Def.'s Mot. Ex. C-1, at 002152. In addition, the project entailed, in part, an initial excavation of BPA's streambanks in order to "divert high water flows from Chickahominy Creek to an excavated basin . . . to create a seasonal wetland overflow area[,]" where "[t]he diversion channel [would] be planted with native vegetation in order to prevent erosion and downcutting." Id. at 002153. The entrance to the referenced basin was located upstream of all riparian planting and revegetation, according to the proposal site plan diagram. Id. at 002156-58.

A second excavation was to take place to reconnect an old stream channel to the creek enabling salmon to escape to the old stream channel. Id. at 002153. Moreover, "[l]arge woody debris [would] be placed in Chickahominy Creek at the upstream and downstream openings of the excavation to prevent erosion or blockage." Id. Proposed riparian buffer tree planting and streambank revegetation included "[a]pproximately 500 feet of streambank on the west side of the creek . . . planted in conifer and deciduous trees" as well as "[w]illow cuttings and ninebark . . . planted on the eroding streambank." Id.

The local Siuslaw Conservation District undertook the project in cooperation with the Oregon Department of Fish and Wildlife ("ODFW"). George Westfall, a Natural Resource Specialist at ODFW, provided substantive feedback on the proposed project, which the project manager for the Water District incorporated into the final project design. Tr. 570-71. Mr. Westfall, on behalf of ODFW, concluded that the project would benefit Oregon's wildlife resources by

---

resulting from a fish and wildlife habitat improvement project done in cooperation and consultation with the pertinent Oregon state authorities. Because the Court concludes that the action is time-barred, it does not address Defendant's alternate grounds for dismissal.

[2] These findings are derived from the record developed at an evidentiary hearing as well as from depositions and exhibits to the parties' motion papers. Additional findings of fact are in the Discussion.

2

improving fish and wildlife habitats in Chickahominy Creek. Tr. 517.

According to a local Siuslaw Conservation District monitoring report from November 2003, the wetland project as proposed was completed in September 2001, with additional plantings completed in February 2002, and replanting planned for February 2004. Def.'s Mot. Ex. A-1, at 000108.

**Erosion on Plaintiff's Property**

On June 26, 2002, Plaintiff, a nurse, purchased 5.58 acres of property situated on the eastern bank of Chickahominy Creek opposite BPA's property to use as her home, as well as a place for her animals, including llamas and goats, to live and graze. Def.'s Mot. Ex. D, at 000438-39; Def.'s Mot. Ex. G, at 001941; Tr. 74; Swartzlander Dep. 26. Chickahominy Creek runs along the entire western border of Plaintiff's property. Prior to the purchase, Plaintiff visited the property in June 2002, and spoke with the then owner Rebecca Comer, who had lived on the property since 1994. Tr. 216-17; Swartzlander Dep. 17. When asked if Plaintiff had discussed erosion with the previous property owner, Plaintiff testified that at the time she did not know what the word erosion meant, but that Ms. Comer had informed her she had been throwing grass clippings into an area along the southern portion of the property to fill in the streambank. Tr. 156-58. During this 2002 visit, Plaintiff observed this southerly bank and "it looked like it was kind of a slope-down lower than . . . the bank north of that." Swartzlander Dep. 27. Plaintiff testified that looking back at what Ms. Comer had told her and what she observed in 2002, it would be logical to conclude that Ms. Comer was taking steps to alleviate ongoing erosion. Id. at 28.

At the time of purchase, Plaintiff was aware that the property was situated in a flood zone. Tr. 279. Plaintiff also understood that her property's western border is legally defined as the center of Chickahominy Creek. The title report, which was prepared during Plaintiff's acquisition of the property, included a title insurance policy that excluded from coverage:

> Any adverse claim based upon the assertion that some portion of said land has been removed from or brought within the boundaries thereof by an avulsive movement of the Chickahominy Creek or has been formed by the process of accretion or reliction or has been created by artificial means or has accreted to such portion so created.

Tr. 155-56. Plaintiff did not understand this paragraph, but at some point, she wrote "creek line move?" on the document. Tr. 156.

Following Plaintiff's purchase of the property in 2002, David Eisler, the wetland restoration project manager with the local Conservation District, visited the property. Tr. 165-66.[3] When asked the purpose of Mr. Eisler's visit to the property, Plaintiff testified:

---

[3]    During her deposition, Plaintiff testified that the first time she met Mr. Eisler was at some point between 2002 and 2003. Swartzlander Dep. 113-14. During her direct examination, Plaintiff stated that this meeting took place around 2003 or 2004, but later testified that this initial meeting occurred prior to September 2003, and was likely soon after she moved to the property in July 2002. Tr. 79, 81-82, 166.

3

> I was on Nelson Mountain Road, which is right off of Transformer Road, with my binoculars watching some young . . . birds . . . . And . . . Sarah, who's Dave's wife -- pulled on to Nelson Mountain Road and stopped to say hi and . . . said that her husband did . . . planting on stream banks and wouldn't it be nice to have some nice plants that, you know, could be on the stream bank. And I said, yeah, sure. And that's how I got in contact with them.

Tr. 77-78. Mr. Eisler testified that the purpose of his visit to Plaintiff's property was Plaintiff's interest in fencing to keep her animals away from the creek and that he likely talked about planting and maintaining plants because restoration was an issue he always talked about. Tr. 566-67.

Following this interaction, Mr. Eisler came to Plaintiff's property with a man who was going to write up a plan to work on Plaintiff's riparian area. Tr. 79. The Conservation District's wetland restoration project manager, Mr. Eisler, testified that during his visit in "approximately 2001, 2002," he saw "obvious erosion. She's on the -- in several places on the active side of the creek." Tr. 567-68. Plaintiff testified that at some point around 2003 or 2004, Mr. Eisler planted willows on the banks of her property, along with a fir tree and a flowering bush. Tr. 170, 172.

In May 2003, Lori Robertson, a watershed conservationist with the Siuslaw Water District, prepared a Project Application Form to obtain funding via a grant from the Oregon Watershed Enhancement Board to help mitigate the ongoing erosion on Plaintiff's property. Def.'s Mot. Ex. F-1, at 002172-74. Plaintiff testified that Ms. Robertson visited the property at least two, possibly three times, prior to September 2003, and that although she did not recall the details of her conversations with Ms. Robertson during her visits, they "talked about a lot of different things" including Plaintiff's property and the riparian area of the streambank. Tr. 83; Swartzlander Dep. 139. Ms. Robertson did not have a specific memory of visiting Ms. Swartzlander's property, but testified that as part of the standard procedure for grant preparation, she "would have conducted a site visit on Ms. Swartzlander's property in order to obtain the information necessary to prepare a small grant application. During the site visit, [Ms. Robertson] would have observed site conditions and included a description of those conditions in the application." Robertson Decl. ¶ 6; Tr. 12.

On or about May 28, 2003, the Conservation District submitted a grant proposal to the Oregon Watershed Enhancement Board ("OWEB"), seeking funding to provide riparian planting and fencing along the creek bank of Plaintiff's property. Def.'s Mot. Ex. F-1, at 002172, 002177. The proposal stated that there was "significant bank erosion in specific locations." Id. at 002172. The application further noted that the proposed project on Plaintiff's property

> [would] help to reduce soil erosion . . . establish riparian vegetation, and enhance a small existing woodland, providing shade, streambank stability and habitat for beneficial aquatic biota and will help to reduce warming of water temperatures. This project will improve pasture management on the site.

Id. at 002173.

The grant application also represented that "Landowner" would provide "weed control, fence installation, vegetation planting, protection and maintenance" in conjunction with the planting the District proposed to do. Id. Ms. Robertson testified that such a grant application was "almost always [a] landowner request because you wanted flexibility and interest by landowners

4

to come visit them . . . ." Tr. 13. Prior to approval, the grant application had to be signed both by a representative of the Siuslaw Soil and Water Conservation District, as the applicant for the grant funds, and by the landowner who would benefit from the grant funds. See Def.'s Mot. Ex. F-1, at 002174.

Four months after the submission of the grant proposal, the Conservation District sent Plaintiff a letter on September 23, 2003, withdrawing this grant application, stating:

> We sent you a letter and OWEB grant application on May 28, 2003 and requested you to sign and return the application. We sent you an OWEB grant agreement that needed your signature. We have left phone messages saying your signature on these documents was required for us to proceed with the grant. We have not heard back from you on these matters.
>
> We are writing you to inform you that the small OWEB grant for your property has been withdrawn.

Id. at 002171.

Ms. Robertson had repeatedly tried to transmit the grant proposal to Plaintiff for her signature and to contact her by phone, but Plaintiff failed to respond. Id. At the hearing, Plaintiff did not recall having seen the grant proposal or having received either Ms. Robertson's September 23, 2003 letter or any phone messages regarding the need for her signature. Tr. 87-89. Plaintiff testified that at that time, she had given use of her mailbox to the fire station across the street from her house and obtained a P.O. Box, suggesting that Ms. Robertson may not have had her correct address. Tr. 88.

Plaintiff testified that sometime after Mr. Eisler's 2002 or 2003 visit to her property, she likely again spoke with Mr. Eisler regarding her streambank:

> I think I had talked to [David Eisler] when this area first started, where its says "fell 2012," when this area first started having something that looked like it was going to be an issue, that there was some damage happening there.
>
> \*     \*     \*
>
> I don't remember exactly the conversation, and I don't remember the exact events. But after that, the Oregon Department of Fish and Wildlife came out to look at that.

Swartzlander Dep. 125. At the hearing, Plaintiff testified that she first noticed erosion on her side of the creek in 2004 or 2005, in an area she identified as her middle pasture where there is cow fencing and welded wire fencing. Tr. 98. Plaintiff observed exposed dirt and a loss of plants, but did not recall seeing that any portion of the bank had fallen in. Tr. 100-01. Plaintiff noticed erosion of about five and a half feet in an area identified by Plaintiff during her deposition as "Fell 2012" in the middle pasture area of her property. Tr. 100; Swartzlander Dep. 164. The referenced area is identified as "Fell 2012" because during a high water event in January 2012, that area "fell into" the creek and was swept away. Swartzlander Dep. 41-42, 91. This area is also referred to as the "S Curve Area." Tr. 473.

5

Bob Buckman, an employee of ODFW, visited Plaintiff's property to view the erosion in the S Curve area sometime in 2005 or 2006. According to Plaintiff, it was approximately 2004, when she asked representatives from the Oregon Department of Fish & Wildlife to come to her property to look at erosion. Tr. 180-81. Plaintiff stated that she "must have called" Mr. Buckman to ask for assistance regarding the area where she observed exposed dirt and lack of vegetation and that "to the best of [her] recollection" that occurred in 2004. Tr. 180-81, 183. Later in the hearing however, Plaintiff testified that this visit took place in 2005 or 2006. Tr. 185. During her deposition Plaintiff testified that this visit with Mr. Buckman occurred in 2005. Swartzlander Dep. 169.

When asked whether in 2005, she was informed that the BPA project was causing erosion to her property, Plaintiff testified that "Bob Buckman said what they did over there is causing this." Tr. 185-86. In a letter sent from Plaintiff's former counsel, Cassie K. Jones, to BPA, the contents of which Plaintiff certified as accurate, Ms. Jones stated that Bob Buckman visited Plaintiff's property in 2005, to inspect the streambank and "confirmed to [Plaintiff] that the most recent work done on BPA's creek band was diverting the flow of water to her side of the creek and was causing the erosion and undercutting that she was observing." Def.'s Mot. Ex. G, at 001942.

Mr. Buckman put Plaintiff in touch with Mr. Westfall, a Natural Resource Specialist at the ODFW. Sometime in 2005 or 2006, Mr. Westfall, as well as BPA employees Dustin Smith and Brett Sherer, visited the site to view the erosion. Tr. 102-03, 185, 814. During this 2005 or 2006 visit, Mr. Westfall recalled seeing "significant erosion" on the property, particularly at the southern end of the property, and also recalled seeing a portion of the fence at the S Curve Area "suspended over the creek . . . ." Tr. 523; Westfall Decl. ¶ 7 (July 10, 2017). Mr. Westfall estimated that the erosion in that area extended "between 30 and 40 feet." Tr. 524. In Defendant's Exhibit 105, an aerial photograph dated June 3, 2000, Mr. Westfall marked where he saw erosion on his three visits to the property, and described the last visit as occurring in approximately 2005. Tr. 537-39; DX 105. According to Mr. Westfall, Plaintiff expressed concern about erosion on her property during this 2005 visit, and asked Mr. Westfall whether she could place "hard surface material" into the creek to remediate erosion. Tr. 539.

During the 2005 or 2006 visit, Mr. Sherer, an environmental engineer with BPA, recalled seeing "caving in that was occurring on the edges," predominantly on BPA's side of the creek. Tr. 502. Mr. Sherer also said that during this visit Plaintiff expressed concern about bank failure on her side of the creek. Tr. 503. According to the January 10, 2014 letter to BPA from Plaintiff's former counsel, BPA's representative informed Plaintiff during Mr. Sherer's 2005 site visit that BPA "was unwilling to undertake any efforts to reverse the effects of the BPA Restoration project." Def.'s Mot. Ex. G, at 001942. According to Plaintiff, the BPA employees "weren't willing to fix their side or my side ever." Tr. 187.

Despite BPA's unwillingness to remediate any erosion, Plaintiff continued to

> ask questions: what can we do here, can we -- how about planting it, how about putting in some rip rap? Every time I saw somebody from BPA, I would say, you know, "this is [sic] needs to be fixed." And they would say, "We're not here for that. We're here for this other thing. We're not concerned about that. We're concerned about the power lines.

Tr. 319-20. When asked "[s]o back in 2004, your reaction was to talk to anybody you could from

6

BPA about this issue with the erosion," Plaintiff responded, "[y]eah. At that spot [S Curve Area] on both sides." Tr. 322.

In 2008 or 2009, Plaintiff asked Jim Dole, an acquaintance of hers and an owner of a forestry contracting business, to cut down a tree on her property, and at Plaintiff's direction, he placed several tree limbs in the creek bed in an effort to mitigate continuing bank erosion. Tr. 105-06; Dole Dep. 17, 42-44; PX 14. Plaintiff stated that this area of erosion where Mr. Dole placed the tree limbs was located south of the original S Curve area of erosion and estimated that it extended approximately five or five-and-a-half feet in 2007 or 2008. Tr. 106. Mr. Dole testified that the erosion at this point was "minor" and extended only a matter of a few feet. Tr. 36. According to Plaintiff, by this time, the erosion in another area - - the original S Curve area of erosion - - had extended to eight or nine feet. Tr. 107.

Plaintiff testified that by 2012, the S Curve area of erosion had grown to 13 feet. Tr. 111. Plaintiff stated that she did not consider this erosion to be "dramatic." Tr. 308. The erosion worsened after the January 2012 high water event when the Creek overflowed its banks onto Plaintiff's property. The water came within inches of flooding Plaintiff's house and barn. Tr. 112. Plaintiff testified that when the water receded,

> large chunks of my stream bank along an approximately 400-foot stretch of the creek was gone. I lost around 2000 square feet of land that was swept away by the creek. Approximately 400 feet of formerly sloped banks that had been full of various vegetation were now unrecognizable, barren, unstable walls of dirt. Deep fissures developed on my land that had never been there before.

Swartzlander Decl. ¶ 10. At the hearing, Plaintiff testified that before 2012, approximately 15 feet of her stream bank was showing erosion or bank failure. Tr. 301-02. Plaintiff also testified that since she has lived on the property, the creek overflowed its banks more than seven times. Tr. 191.

Following the high water event, in 2012, Plaintiff made additional efforts to reverse some of the erosion to her property, including tying down branches on the creek bank to "slow the water down from hitting . . . that site as hard." Tr. 193. Plaintiff also planted ninebarks on the northern end of her property. Tr. 193. A BPA contractor who was removing blackberry on her property placed dirt over the branches Plaintiff had placed on the bank, at Plaintiff's request. Swartzlander Dep. 78. Despite these efforts, Plaintiff testified that since 2012 "water keeps coming on to my property at . . . a faster rate." Tr. 323.

In her January 10, 2014 letter to BPA claiming damages to her property from its restoration project, Plaintiff through counsel summarized the chronology of events as follows:

> **Property Damage**
>
> The work BPA had completed on their property [apparently in 2002-04] changed the course and flow of the creek and increased the water pressure on Ms. Swartzlander's property on the east side of the creek.
>
> In 2004, Ms. Swartzlander requested that representatives from BPA and Oregon Department of Fish and Wildlife ("ODFW") come to her property to observe the

7

erosion and undercutting that had begun to occur on her creek bank due to changes that had been made to the creek.  Though it was observed that Ms. Swartzlander's property was in fact under increased pressure from the creek causing erosion problems, a BPA representative indicated that BPA's side of the creek was looking good and that BPA was unwilling to undertake any efforts to reverse the effects of the BPA Restoration project.

The erosion and removal of lateral support from Ms. Swartzlander's property continued and in 2005 a representative from ODFW, Bob Buckman, came to inspect the continued loss of Ms. Swartzlander's property.  Mr. Buckman confirmed to Ms. Swartzlander that the most recent work done on BPA's creek band was diverting the flow of water to her side of the creek and was causing the erosion and undercutting that she was observing.

Despite requests for assistance, no one was willing to aid Ms. Swartzlander in preventing the continued erosion.  The erosion and undercutting continued unabated and in late winter of 2012 (sometime in late January-February) snowballed.  At that time a large segment of Ms. Swartzlander's property was washed away.

*     *     *

Due to the actions of BPA in altering the flow of the Chickahominy Creek, Ms. Swartzlander's property has been taken without compensation and the land is subject to continuing erosion and removal of lateral support that threatens her entire property.

Def.'s Mot. Ex. G, at 001942.

On October 14, 2015, Plaintiff wrote a letter to United States Senator Ron Wyden, stating:

Approximately 15 years ago BPA had an extensive restoration project completed on their creek bank.  This has resulted in altering the flow of the creek, causing extensive erosion on my creek bank.  This is increasing the risk of flooding of my home in time of high water.  For the past 12 years, I have tried to work with BPA, to no avail.  Even though an employee of The Oregon Fish and Wildlife [sic], an employee of Soil and Water Conservation District, and a Geologist, have all assessed the area and concluded my property has been and will continue to be damaged as a result of BPA's "restoration" project.

Def.'s Ex. H, at 00205-06.

On December 23, 2015, Plaintiff filed her complaint in this court seeking $225,387 in just compensation for Defendant's alleged taking.

8

## Discussion

### The Statute of Limitations

The Court of Federal Claim's six-year statute of limitations is a jurisdictional requirement that cannot be waived, as it is a prerequisite for the waiver of sovereign immunity in suits against the United States for money damages. John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 133-34 (2008); see also MacLean v. United States, 454 F.3d 1334, 1336 (Fed. Cir. 2006) (quoting Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1576-77 (Fed. Cir. 1988)) ("The statute of limitations 'is a jurisdictional requirement attached by Congress as a condition of the government's waiver of sovereign immunity and, as such, must be strictly construed.'"). When the court's subject matter jurisdiction is in question, the plaintiff bears the burden of demonstrating subject matter jurisdiction by a preponderance of the evidence. See Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).

Under 28 U.S.C. § 2501 "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501 (2012). Generally, a Fifth Amendment "takings claim accrues 'when [1] all events which fix the government's alleged liability have occurred and [2] the plaintiff was or should have been aware of their existence.'" Boling v. United States, 220 F.3d 1365, 1370 (Fed. Cir. 2000) (quoting Hopland Band of Pomo Indians, 855 F.2d at 1577).

When a taking occurs by a gradual or continuous physical process, a Fifth Amendment claim accrues when the condition "stabilizes." Mildenberger v. United States, 643 F.3d 938, 945 (Fed. Cir. 2011) (stating in a case involving pollutants being released into a river that the stabilization doctrine "recognizes that determining the exact point of claim accrual is difficult when the property is taken by a gradual physical process rather than a discrete action undertaken by the Government such as a condemnation or regulation"). "[S]tabilization occurs when it becomes clear that the gradual process set into motion by the government has effected a permanent taking, not when the process has ceased or when the entire extent of the damage is determined." Boling, 220 F.3d at 1370-71. The key factor in determining when a condition has stabilized in cases of erosion is assessing "'whether the permanent nature of the taking was evident such that the landowner should have known that the land had suffered erosion damage.'" Banks v. United States, 741 F.3d 1268, 1280 (Fed. Cir. 2014) (quoting Boling, 220 F.3d at 1373).

Here, the parties dispute when Plaintiff's cause of action for the alleged taking accrued. Defendant asserts that the erosion on Plaintiff's property stabilized no later than 2005 or 2006, when, by Plaintiff's own admission, an ODFW representative, Mr. Buckman, confirmed "that the most recent work done on BPA's creek band was diverting the flow of water to her side of the creek and was causing the erosion and undercutting she was observing." Def.'s Mot. Ex. G, at 001942. In turn, Plaintiff asserts that the erosion stabilized no earlier than the January 2012 high water event. Plaintiff asserts that even if she had actual knowledge of some erosion on her property by 2006, the damage had not made such substantial inroads into the property so as to make the permanent nature of the taking evident.

**Plaintiff Knew or Should Have Known of the Permanent Nature of the Erosion on her Property at Least as Early as 2006**

Under the stabilization doctrine, a condition stabilizes when the nature of the taking becomes evident, damages are reasonably foreseeable, and the plaintiff knew or should have known that the claim existed. See Mildenberger, 643 F.3d at 946; Boling, 220 F.3d at 1371 (stating that a claim accrues "once it is clear that the process has resulted in a permanent taking"); Fallini v. United States, 56 F.3d 1378, 1380 (Fed. Cir. 1995) (stating that whether plaintiff knew or should have known claim accrued is evaluated under an objective standard and that "a plaintiff does not have to possess actual knowledge of all the relevant facts in order for the cause of action to accrue"). The "touchstone for any stabilization analysis is determining when the environmental damage has made such substantial inroads into the property that the permanent nature of the taking is evident and the extent of the damage is foreseeable." Boling, 220 F.3d at 1372.

Applying the stabilization doctrine here, the following facts of record indicate that no later than 2006, Plaintiff knew or should have known of the enduring nature of the erosion on her property allegedly stemming from BPA's wetland restoration project:[4]

- In 2003, the Conservation District provided Plaintiff with notice of ongoing erosion to her stream banks. Def.'s Mot. Ex. F-1, at 002171. In 2003, Lori Robertson, a watershed conservationist with the Siuslaw Water District who visited Plaintiff's property at least twice, prepared a Project Application Form to obtain grant funding from the Oregon Watershed Enhancement Board to provide riparian planting and fencing to help mitigate ongoing erosion on Plaintiff's property. Id. at 002172-74. The local Conservation District submitted this grant proposal to the Oregon Watershed Enhancement Board on or about May 28, 2003. Id. at 002177. The proposal stated that there was "significant bank erosion in specific locations." Id. at 002172. The grant application was approved on June 28, 2003. Id. at 002177.[5]

- Plaintiff testified that she first noticed erosion of about five and a half feet on her property in 2004 or 2005. Tr. 98-100.

- When asked "[s]o back in 2004, your reaction was to talk to anybody you could from BPA about this issue with the erosion," Plaintiff responded, "[y]eah. At that spot [S Curve Area] on both sides." Tr. 322.

- Plaintiff testified that in 2005 or 2006, she was aware of erosion in the "fell 2012" area and that by then erosion in that area "looked like it was it was going to be an issue, that there

---

[4] According to a Conservation District Wetland Restoration Monitoring Report, the wetland project as proposed was completed in September 2001, with additional plantings completed in February 2002, and replanting planned for February 2004. Def.'s Mot. Ex. A-1, at 000108.

[5] Despite the Conservation District's numerous requests that Plaintiff sign and return the application, Plaintiff never responded, so the grant application was withdrawn. This does not alter the fact that local conservation district personnel had noticed "significant bank erosion" on Plaintiff's property as early as May 28, 2003, sufficient to warrant funding to "reduce soil erosion." Def.'s Mot. Ex. F-1, at 002174.

10

was some damage happening there." Swartzlander Dep. 125. As a result of this observation, Plaintiff reached out to the Oregon Department of Fish and Wildlife to visit her property. Id.; Tr. 183-84.

- In 2005, Bob Buckman of the Oregon Department of Fish and Wildlife visited Plaintiff's property to inspect the streambank and "confirmed to [Plaintiff] that the most recent work done on BPA's creek band was diverting the flow of water to her side of the creek and was causing the erosion and undercutting she was observing." Def.'s Mot. Ex G, at 001942; Tr. 185-86.

- Following Mr. Buckman's visit in 2005 or 2006, Mr. Westfall, a Natural Resource Specialist at the Oregon Department of Fish and Wildlife, as well as BPA employees Dustin Smith and Brett Sherer, visited Plaintiff's property to view the erosion. Tr. 102-03, 185, 814. During this 2005 or 2006 visit, Mr. Westfall observed "significant erosion" on the property, particularly at the southern end of the property, and also recalled seeing a portion of the fence at the S Curve Area "suspended over the creek . . . ." Tr. 523; Westfall Decl. ¶ 7 (July 10, 2017). Mr. Westfall estimated that the erosion in that area extended "between 30 and 40 feet." Tr. 524.

- Mr. Westfall credibly testified that during his 2005 or 2006 visit, Plaintiff expressed concern about erosion on her property and asked Mr. Westfall whether she could place "hard surface material" into the creek to remediate erosion. Tr. 539.

- Mr. Sherer, an environmental engineer with BPA, credibly testified that during the 2005 or 2006 visit Plaintiff expressed concern about bank failure on her side of the creek. Tr. 503.

- Plaintiff testified that Defendant's representative, Brett Sherer, informed Plaintiff that Defendant "wasn't going to do anything about the erosion on the BPA side." Tr. 104. Plaintiff further testified that Mr. Westfall "wanted to slope both banks, but they -- they didn't want to. They didn't want to slope their side. And then [Mr. Westfall] said there was nothing he could do." Tr. 319. Plaintiff understood that BPA representatives "weren't willing to fix their side or my side ever." Tr. 187.

- In her counsel's January 2014 letter to BPA, Plaintiff represented that in 2005, Bob Buckman inspected her property and confirmed to Plaintiff that the work done as part of BPA's wetland restoration project was causing the erosion on her property. Def.'s Mot. Ex. G, at 001941-43.

- In her 2015 letter to Senator Wyden, Plaintiff stated she had been attempting to work with BPA for 12 years, so as of approximately 2003, to address the fact that her "property has been and will continue to be damaged as a result of BPAs 'restoration' project," which has "resulted in altering the flow of the creek, causing extensive erosion on [her] creek bank," but that "BPA has been completely unwilling to work with [her]." Def.'s Mot. Ex. H, at 00205-06.

- Plaintiff's expert, Dr. Schlieder,[6] testified that, based on his review of aerial photographs, from 1995 to 2009, the southern area of the subject property had experienced bank erosion of "more than 500 feet." Tr. 365-66. The aerial photograph used by Dr. Schlieder to illustrate his opinion was taken on May 17, 2009, more than six years before Plaintiff filed her complaint.

As the above recitation of facts indicates, although Plaintiff's recollection of events giving rise to her claim was vague, the weight of the evidence - - including documentary evidence - - and the testimony of witnesses who observed the condition of Plaintiff's property firsthand, establishes that Plaintiff knew or should have known of the erosion allegedly caused by BPA and BPA's unwillingness to mitigate such erosion at least by 2006. The fact that the erosion had made substantial inroads into Plaintiff's property by 2006, is evidenced by the Conservation District's efforts to assist Plaintiff in mitigating what it characterized as significant erosion as early as 2003, as well as by the testimony of Mr. Westfall that he observed firsthand significant erosion on Plaintiff's property in 2005-06, and Messrs. Sherer and Westfall's testimony that Plaintiff herself expressed concern about the erosion in this time frame. As the Federal Circuit found in Boling, stabilization "is not deferred until the progressive environmental damage stops, but occurs when the environmental forces have substantially and permanently invaded the private property such that the permanent nature of the taking is evident and the extent of the damage is reasonably foreseeable." 220 F.3d at 1371. To be reasonably foreseeable it is sufficient that the damage be a "natural consequence of the Government's act[.]" See Cotton Land Co. v. United States, 109 Ct. Cl. 816, 829, 75 F. Supp. 232, 234 (Ct. Cl. 1948). Here, damage to Plaintiff's property not only was foreseeable, significant erosion had occurred by 2006, and Plaintiff knew that BPA had refused to mitigate this erosion at that time. Because Plaintiff did not file suit until almost nine years after the accrual of her cause of action in 2006, this action is untimely.

Plaintiff argues, however, that the accrual date for her cause of action should be suspended until 2012, because the full extent of the damage to her property was "inherently unknowable" until the 2012 high water event occurred. "[A]ccrual of a claim against the United States is suspended, for purposes of 28 U.S.C. § 2501, until the claimant knew or should have known that the claim existed." Banks, 741 F.3d at 1279-80. "[A] plaintiff does not have to possess actual knowledge of all the relevant facts in order for the cause of action to accrue." Fallini, 56 F.3d at 1380.

To establish that the accrual suspension rule is applicable, Plaintiff must show either that Defendant "'has concealed its acts with the result that [she] was unaware of their existence'" or that her injury was "'inherently unknowable at the accrual date.'" Banks, 741 F.3d 1280 (quoting

---

[6] The Court admitted Dr. Gunnar Schlieder as an expert in the fields of certified engineering geology and geologic geotechnics. Tr. 362. Dr. Schleider received the equivalent of a Bachelor of Science in geology from the Technische Universität München in 1978, a Master of Science in Geology from The George Washington University in 1984, and a Ph.D. in geology from Lehigh University in 1989. Pl.'s Ex. 31, at 1. Dr. Schlieder is licensed as a certified engineering geologist and a registered geologist by the State of Oregon, is a member of the Association of Engineering Geologists and Sigma Xi Honor Society, and is the president of GeoScience, Inc. Id. Dr. Schlieder has project experience in stream bank erosion, slope stability, foundations, soils and drainage, forensic geology, mineral resource evaluation, and hyrdogeologic projects. Id. at 2-17.

Young v. United States, 529 F.3d 1380, 1384 (Fed. Cir. 2008)). "The inherently unknowable test 'includes a reasonableness component.'" Id. (quoting Holmes v. United States, 657 F.3d 1303, 1320 (Fed. Cir.2 011)). An injury is not inherently unknowable if at the time of the accrual date the claimant knew or reasonably should have known of the injury. See id. In the instant case, as of 2006, the erosion damage to Plaintiff's property allegedly stemming from BPA's wetland restoration project was evident. Representatives of ODFW observed significant erosion at least as early as 2005-06, and related that Plaintiff had expressed concern about the erosion at that time. Plaintiff herself testified that by 2006, she was aware that BPA's wetland restoration project was causing erosion on her land and that the Conservation District would not make any effort to mitigate erosion on her property. Tr. 319; Swartzlander Dep. 159; Def.'s Mot. Ex. G, at 001942. Plaintiff's testimony is confirmed by that of Messrs. Buckman, Westfall, and Sherer and by her counsel's 2014 letter to BPA and her own 2015 letter to Senator Wyden. As such, there is no basis to apply the accrual suspension doctrine here.

## Conclusion

Plaintiff's claim accrued at the latest in 2006, almost nine years before Plaintiff filed the instant action on December 23, 2015. Thus, Plaintiff's action is time-barred under 28 U.S.C. § 2501.

Defendant's motion to dismiss this action for lack of jurisdiction is **GRANTED**. The Clerk is directed to dismiss this action.

 s/Mary Ellen Coster Williams  
**MARY ELLEN COSTER WILLIAMS**  
**Senior Judge**